**In re Donald Cletus ICSMAN, Debtor(s).**

**SIGNAL FINANCE OF OHIO, Plaintiff,**

**v.**

**Donald Cletus ICSMAN, Defendant.**

**Bankruptcy No. 85–0272.**

United States Bankruptcy Court, N.D. Ohio, W.D.

May 14, 1986.

James S. Nowak, Toledo, Ohio, for plaintiff.

Robert T. Kelsey, Sandusky, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court for Trial on the Complaint To Determine Dischargeability of Debt. The Court has conducted the Trial, and has heard the evidence and arguments offerred by each of the parties. The Court has reviewed the evidence, the arguments, and the entire record in this case. Based upon that review and for the following reasons the Court finds that the debt addressed in the Complaint should be held non-dischargeable.

## FACTS

The majority of facts in this case do not appear to be in serious dispute. The Defendant-Debtor was the owner-operator of a "drive-thru" business known as the Variety Village. He is also an attorney licensed to practice in the State of Ohio.

At some time during 1982, the Debtor and one Leonard J. LaRose (hereinafter LaRose) initiated negotiations regarding the possibility of entering into a partnership for the ownership and operation of the Debtor's drive-thru business. Although it does not appear that a written partnership agreement was executed, the evidence reflects that LaRose advanced Ten Thousand and no/100 Dollars ($10,000.00) to the Debtor in furtherance of their contemplated arrangement. The characterization of this advance is seriously disputed by the parties. The Debtor contends the advance was part of an oral partnership agreement that was consummated between himself and LaRose. The Plaintiff contends that the advance constituted a loan. The terms of the advance are not entirely clear. However, it apears that LaRose neither participated in business activities nor received any of the proceeds therefrom. It also appears that the Debtor has, during the course of the underlying bankruptcy case and other legal proceedings, referred

to the advance as a loan. It should be noted that the Debtor's schedules reflect an unsecured obligation to LaRose for a "PERSONAL [L]OAN" in the amount of Forty Thousand and no/100 Dollars ($40,000.00), and that this obligation is the subject of a law suit filed in the Erie County Court of Common Pleas. It does not appear that the obligation listed in the petition is related to the Ten Thousand and no/100 Dollar ($10,000.00) advance.

The evidence also indicates that the Debtor had some financial involvement with the Citizens Banking Co. (hereinafter Citizens). At some time during 1983, the Debtor executed a sixty (60) day promissory note to Citizens. As security for this debt, Citizens took an interest in a passbook account and a 1979 Buick automobile. At the time this obligation became due, the Debtor "rolled over" the note into another thirty (30) day obligation, and paid the interest currently due. It appears that this loan has been rolled over on several subsequent occasions. The Debtor testified that at all times between the execution of the original note and the filing of his petition, the vehicle was subject to Citizen's security interest. The purpose of these notes is unclear. However, the schedules reflect that Citizens has been listed as an unsecured creditor in the amount of Four Thousand Five Hundred and no/100 Dollars ($4,500.00). The schedules also indicate that the debt was incurred "FOR PURCHASE OF A 1979 BUICK REGAL AUTOMOBILE FOR EX–WIFE".

On or about March 7, 1984, the Debtor applied for a Ten Thousand and no/100 Dollar ($10,000.00) loan from the Plaintiff. Although the circumstances, purpose, and characterization of the loan application had been discussed several days earlier, it appears that it was actually submitted on March 7, 1984. The application process was conducted in a telephone conversation between the parties, with the Debtor calling from his place of business in Sandusky, Ohio, to the Plaintiff's office in Bowling Green, Ohio. During the course of that conversation, the Debtor was asked to disclose both his current outstanding obligations and the amount of his income. In response to the former subject, the Debtor indicated that he had outstanding obligations to Montgomery Wards and the May Co., as well as a note and mortgage to the First Federal Savings & Loan Co. on his residential real estate. He also disclosed a pre-existing obligation to the Plaintiff which is not addressed in this action and not scheduled on the petition. With regard to his vehicles, the Debtor indicated to the Plaintiff's agent that he leased one automobile and owned another. The agent inquired as to whether or not the latter vehicle was free and clear of any liens. The Debtor indicated that it was. The Debtor did not disclose the obligations to LaRose or Citizens.

With regard to the Debtor's income, the Debtor indicated that he received approximately Two Thousand and no/100 Dollars ($2,000.00) per month from his drive-thru business and approximately One Thousand Five Hundred and no/100 Dollars ($1,500.00) from his activities as an attorney. There is some dispute over whether or not the agent inquired if this income was net income or gross income. However, the Plaintiff's agent testified that she did inquire whether these figures constituted the Debtor's income "after expenses". For purposes of processing the loan, the Plaintiff used the Three Thousand Five Hundred and no/100 Dollars ($3,500.00) per month figure as representative of the Debtor's monthly income. It should be noted that the Debtor had two prior obligations with the Plaintiff, both of which were described by the Plaintiff's agents as "positive". It should also be noted that at some time prior to submitting the application in question, the Plaintiff had denied the Debtor's application for a loan based upon the Debtor's business.

Subsequent to completing the application, the Plaintiff's agent initiated a credit check of the Debtor with the agency located in the Debtor's vicinity. The results of that check revealed that in addition to the debts disclosed on the application, the Debtor had obligations to Elder Beerman

and the Sears & Roebuck Co. The report also disclosed that there was a lien against the 1979 Buick. The report did not contain any information relative to the LaRose obligation. In an effort to verify this additional information, the agent contacted Citizens. Citizens declined to respond to the Plaintiff's inquiries as to the Debtor's credit worthiness and the circumstances of the lien. In a further attempt to obtain additional information, the agent contacted the Debtor. This effort was made so as to afford him the opportunity to explain the discrepancies between the application and the credit report. The Debtor explained that there may have been some confusion at Citizens as to whether the obligation they reflected was actually owed by his father or by himself. He also explained that the vehicle was clear of any liens. There is some dispute over whether or not the agent expressed any interest in obligations owed by the Debtor's business. The Debtor indicated that he offerred such information, but was told that it was not required. The agent indicated that she would have inquired about such obligations if she had known any existed.

After receiving the information from the Debtor, another of the Plaintiff's agents began to assess the Debtor's eligibility for the loan. After totalling his monthly obligations and the amount established by company policy for each of an applicant's dependents, the Plaintiff was able to establish the amount of monthly expenditures the Debtor should reasonably expect to incur. By comparing that figure with the Debtor's income, the Plaintiff was able to determine the amounts available to service a prospective loan. The agent's assessment of the Debtor's application indicated that his income would not be sufficient to service the proposed loan. This conclusion was based upon standards established by company policy regarding the margin of income which an applicant must have available. However, the agent also determined that because the Debtor's financial situation was close to meeting the company's standards, they would extend a loan if the Debtor would grant them a second mortgage on his residence and be willing to accept slightly less than the full amount requested. The Debtor accepted the Plaintiff's proposal and, on April 6, 1984, after reviewing the loan application, executed the application along with all other documents necessary for closing the transaction. It should be noted that the agent responsible for reviewing the application testified that if he had known about the Debtor's obligation to LaRose and the lien held by Citizens, the loan would not have been made.

The Debtor filed his voluntary Chapter 7 petition with this Court on June 26, 1985. In the schedules which accompany that petition, the Debtor lists obligations to certain creditors, all of which were either disclosed to the Plaintiff at the time the application was submitted or incurred after the loan was extended. However, a review of the Debtor's statement of affairs finds that the Debtor made payments to several creditors in the year that preceded the filing of his petition. It also appears that these creditors were paid subsequent to the Debtor's receipt of the loan. As reflected on the petition, such payments were made to the "Northwest Bank" and the "Savings Bldg. & Loan Co." These obligations were not disclosed to the Plaintiff in the Debtor's financial statement. It is unclear when these debts arose.

In response to the filing of the petition, the Plaintiff filed the above entitled adversary action. In that action, the Plaintiff asserts that the debt for the loan which originated on or about March 7, 1984, should be held to be nondischargeable. Specifically, the Plaintiff asserts that the debt in question was created through the use of a financial statement which did not reflect all the Debtor's obligations, and that the statement was relied upon by the Plaintiff in extending the credit. In support of these assertions, the Plaintiff offered certain documents that were used in processing the Debtor's application. These documents included the application form on which the information provided by the Debtor was recorded. They also included

the worksheet on which all credit information obtained about the Debtor was placed. These documents and the information found thereon was corroborated by the testimony of the agents involved in the disputed transaction.

The Debtor contests the allegations in the Complaint, arguing that the statement as to his financial condition was not fraudulent. Specifically, he asserts that he did not offer the statement with any intent to deceive the Plaintiff, and that he disclosed all obligations in which the Plaintiff demonstrated any interest. He also contends that because of marital problems which existed at the time he applied for the loan, his preoccupation with those problems may have contributed to the fact that he inadvertently omitted certain obligations from the application. The Debtor further contends that at the time the application was submitted, he did not believe that the obligation to LaRose was the type of debt the Plaintiff would be interested in having disclosed, inasmuch as it was an investment in his business and, therefore, a business obligation. In support of these contentions, the Debtor offered a copy of the divorce decree, an unexecuted partnership agreement between LaRose and himself, and a general release of the Ten Thousand and no/100 Dollars ($10,000.00) obligation signed by LaRose.

## LAW

The provisions of 11 U.S.C. Section 523(a)(2) state in pertinent part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive ...

Under these provisions, a debt which arises through the use of a written financial statement will not be dischargeable in bankruptcy if the statement: 1) was materially false, 2) had to do with the debtor's financial condition, 3) was offered to the plaintiff with the intent to deceive, and 4) the plaintiff reasonably relied on the statement. *Thorp Credit Inc. of Ohio v. Saunders (In re Saunders)*, 37 B.R. 766 (Bkcy. N.D.Ohio 1984), *Investors Consumer Corporation, Inc. v. Goff (In re Goff)*, 17 B.R. 564 (Bkcy.W.D.Ky.1982). Intent may be inferred from either the circumstances of the case or the debtor's conduct. *Thorp Credit Inc. of Ohio v. Saunders*, supra, *H.C. Prange Co. v. Schnore (Matter of Schnore)*, 13 B.R. 249 (Bkcy.W.D.Wis. 1981). It must also be shown that the plaintiff's reliance on the written statement was reasonable. Reasonable reliance is that degree of care which would be exercised by reasonably cautious persons in an average business transaction under similar circumstances. *First Security Bank of Fox Valley v. Ardelean (In re Ardelean)*, 28 B.R. 299 (Bkcy.N.D.Ill.1983). This standard imposes a duty on the creditor to make a reasonable inquiry as to the information provided by the statement.

A review of the facts finds that the existence of certain elements of 11 U.S.C. Section 523(a)(2)(B) is not contested. It is readily apparent that the loan application signed by the Debtor was a written statement, and that it was published by the Debtor with regard to his application for a loan. It is also apparent that the information provided by the Debtor pertained to the Debtor's assets and liabilities. Furthermore, this document was used by the parties during the loan application process, and was relied upon to some extent in assessing the Debtor's credit worthiness. Based upon these uncontested facts, it must be concluded that the Debtor published a written statement respecting his financial condition which was relied on by the Plaintiff and was used to obtain an exten-

sion of credit. It must also be concluded that the only elements which remain to be determined are whether or not the statement was materially false, whether the Plaintiff's reliance on the statement was reasonable, and if the statement was published with the intent to deceive.

■ With regard to the question of whether or not the statement was materially false, a review of the loan application finds that no reference to the obligations to Citizens, Elder Beerman, and Sears, Roebuck & Co. is made. The testimony and the schedules clearly indicate that those obligations were owed at the time the application was submitted. Those obligations represent a significant percentage of the Debtor's obligations which existed at the time the application was completed. Also significant is the ommission of the debt to LaRose. This debt, though relating to the Debtor's business, was an obligation for which he was personally liable. While it is unclear whether or not the Debtor was apprised of the standards used by the Plaintiff in assessing an applicant's eligibility, the material nature of these obligations is made apparent from the testimony of the agent who reviewed the application. That testimony indicated that the loan in question would not have been made had the debts been disclosed. Therefore, in view of the degree to which these omissions negatively effected the portrail of the Debtor's financial condition, it must be concluded that the statement was materially false.

The next question which must be resolved is whether or not the Plaintiff's reliance on the statement was reasonable. As previously indicated, a creditor proceeding under 11 U.S.C. Section 523(a)(2)(B) must make reasonable inquiry into the information provided by a debtor in order to have its reliance on the statement found to be reasonable. *Thorp Credit Inc. of Ohio v. Saunders*, supra. A review of the present case finds that the Plaintiff did inquire as to the veracity of the information provided by the Debtor. Specifically, the agent who recorded the information from the Debtor testified that she inquired whether the Buick automobile was subject to any liens, and whether the Debtor had any debts other than the ones she specifically mentioned. After obtaining this information, the agent contacted the credit bureau in an effort to verify the information's completeness and accuracy. This inquiry revealed additional obligations that were not reflected on the application. While she testified that it is not uncommon for an applicant to inadvertently omit a debt to a retail creditor, she also indicated that the credit report's indication of a lien against the vehicle caused her to make further inquiries. Upon undertaking such inquiries, she was unable to obtain any additional information from the lienholder. At this point, her only recourse was to request additional information from the Debtor.

■ While the Plaintiff's inquiry about the lien is consistent with the duty to make reasonable investigation, it is apparent that an oral explanation as to the discrepancy could not be as certain to disclose a lien as would an inspection of the certificate of title. To this extent, the Plaintiff's reliance on the application was not sufficient to meet the test of reasonability. However, the failure to check the title is not, under the facts and circumstances of this case, sufficient to hold that the Plaintiff's reliance was unreasonable. While the provisions of 11 U.S.C. Section 523(a)(2)(B) impose upon a creditor the duty to make reasonable inquiry, they do not require a party to make all possible inquiries. It also does not require a creditor to investigate all possible avenues when the information on an application is not the sole source of the creditor's reliance. Where a creditor has had favorable prior dealings with a debtor and, in consideration of all circumstances, can reasonably expect that an obligation can and will be satisfied, then partial reliance on a financial statement is reasonable. Stated differently, where a creditor has knowledge of factors other than the ones set forth on a financial statement which would lead a prudent businessman to reasonably expect that he will be

able to look to a debtor or the debtor's assets for satisfaction of a debt, then the standard by which reasonable reliance on a financial statement is measured will be lower. *See, Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir.1985), *Sparkman v. Janes (In re Janes)*, 51 B.R. 932 (Bkcy.D.Kan.1985), *St. Charles Savings & Loan Ass'n. v. Besch (In re Besch)*, 42 B.R. 45 (Bkcy.N.D.Ill. 1984).

In the present case, a review of the testimony reflects that the focus of the Plaintiff's concerns was not towards finding sufficient equity in the Debtor's property to secure the loan. Although the Plaintiff took a second mortgage in the Debtor's residence, the testimony indicates that the Plaintiff did not actually intend to look to the real estate in the event of default. The absence of this intent is apparent from the Plaintiff's testimony which indicated that a first mortgagee already held a lien for a substantial amount of the property's value, and that the loan was not large enough to justify the expense of acquiring the property in the event of foreclosure. Rather, the focus of the Plaintiff's inquiry was on whether or not, in the absence of a security agreement, the Plaintiff could be satisfied from either the Debtor's future income or his existing assets. It was also directed at disclosing whether the Debtor had sufficient property to attach in the event of default, and whether or not there were numerous other creditors with whom the Plaintiff would have to compete in the attachment process. The financial statement provided by the Debtor and the extent of the inquiries made by the Plaintiff were reasonably calculated to elicit the information they required. In view of the Debtor's prior history with the Plaintiff, the fact that the Debtor's business was not subject to liens, and that the Debtor did not have a significant amount of disclosed unsecured debt, it cannot be said that the extent of the Plaintiff's reliance on the statement was unreasonable. This is made especially apparent in light of the fact that the debt to LaRose would not have appeared in a credit report, and that the Plaintiff queried the Debtor about other debts not specifically called for by the application. Therefore, in consideration of the inquiries made by the Plaintiff and the totality of the circumstances of this case, it must be concluded that the Plaintiff's reliance on the financial statement was reasonable.

The final element which must be shown is that the Debtor published the statement with the intent to deceive. It is well established that intent may be inferred from the facts and circumstances of a case. *Sparkman v. Janes*, supra, *McReynolds v. Carr (In re Carr)*, 49 B.R. 208 (Bkcy.W.D.Ky. 1985). In the present case, the testimony indicates that the Debtor told the Plaintiff's agents that the 1979 Buick was free and clear of all liens. However, a subsequent investigation revealed that there was, in fact, a lien against the vehicle. At trial, the Debtor admitted that a lien existed against the vehicle at the time the application was submitted. The inferences which may be drawn from this discrepancy cannot be adequately or reasonably explained as an inadvertent omission. Rather, the Debtor's responses to both the initial and follow-up questions of the Plaintiff, when compared to the information reflected on the credit report and the schedules, lead this Court to conclude that the Debtor intentionally withheld information from the Plaintiff relative to the vehicle in an effort to create a more favorable financial profile.

In addition, the Court notes that the Debtor is both a business man and an attorney licensed to practice in Ohio. As an attorney, he is familiar with the rights and liabilities attendant to those involved in commercial transactions. He also has a heightened awareness of the responsibilities which must be carried out in the creation of contractual arrangements. As a businessman, he was or should have been cognizant of the specific information that one would be required to disclose in an effort to obtain credit. In light of the these factors, this Court cannot accept the Debtor's testimony that he did not feel obligated to disclose the outstanding loan

to Citizens. It also cannot accept his explanation that the advance by LaRose was a business debt, and that as such it was somehow divorced from debts on which he was personally liable. A review of the evidence clearly suggests that the Ten Thousand and no/100 Dollars ($10,000.00) advance by LaRose was an obligation for which the Debtor was personally obligated.

Furthermore, the Court does not find merit in the Debtor's testimony that he was not asked about other debts in a manner which suggested that the Plaintiff would be interested in having such debts disclosed. The evidence reflects that the Plaintiff's agent inquired of him as to whether or not he had obligations which did not fall into the specific categories set forth on the application. As an attorney, he knew or should have known that obligations incurred by a sole proprietor, whether for business or otherwise, are obligations for which the proprietor is personally liable. Even if the Ten Thousand and no/100 Dollars ($10,000.00) advance was part of a partnership agreement, the debt was still one on which he was liable, inasmuch as a general partner is personally liable to other partners for the pro-rata value of the other partner's contribution. Despite knowledge of this fundamental legal precept, the Debtor denied having outstanding obligations to other creditors. The significance of this omission is made particularly apparent in light of the fact that the Plaintiff had recently denied the Debtor an extension of credit that was to be characterized as a "business" loan, and that the Debtor was aware he would have to improve the perception of his financial condition in order to obtain the loan. These facts, when viewed in relation to all the other facts and circumstances adduced at trial, require this Court to conclude that the Debtor intentionally failed to disclose relevant and material information to the Plaintiff regarding his financial obligations. Therefore, it must also be concluded that the financial statement was published by the Debtor with the intent to deceive.

Based upon the foregoing analysis, the Court must conclude that the Plaintiff has demonstrated sufficient facts so as to establish all the elements of nondischargeability under 11 U.S.C. Section 523(a)(2)(B). The Plaintiff has shown that the Debtor received an extension of credit through the use of a written statement, and that the statement involved the Debtor's financial condition. The Plaintiff has also shown that the statement was materially false, that it reasonably relied on the statement in extending the credit, and that the Debtor published the financial statement with intent to deceive the Plaintiff. Although the Debtor has presented evidence in an attempt to demonstrate the absence of certain elements, the weight of such evidence does not overcome the facts established by the Plaintiff and the reasonable inferences drawn therefrom. Accordingly, it must be concluded that the Plaintiff is entitled to judgment, and that the debt in question should be held to be non-dischargeable.

In reaching these conclusions the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion.

It is ORDERED that Judgment be, and is hereby, entered for the Plaintiff.

It is FURTHER ORDERED that the debt to the Plaintiff be and is hereby held NONDISCHARGEABLE.